UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**JOHANN LEPRICH,**

       **Petitioner,**

                              Case No. 1:06-CV-679
**v.**                                  Hon. Gordon J. Quist

**ALAN L. BYAM,** *et al.***,**

       **Respondents.**
_____/

**REPORT AND RECOMMENDATION**

Petitioner, through his attorney, brought this habeas action pursuant to 28 U.S.C. § 2241. Petitioner was released from government custody on October 16, 2006. This matter is now before the court on respondents' motion to dismiss the petition as moot (docket no. 5). Petitioner does not oppose the motion.

**I.**       **Background**

Petitioner, a former member of the *Waffen* SS, participated in the persecution of Jews, Gypsies and other ethnic groups during the Second World War, misrepresented his wartime service and illegally procured American citizenship. Petitioner has a long history in the federal court system extending back approximately twenty years.

*United States v. Leprich*, 666 F. Supp. 967 (E.D. Mich. 1987), involved a proceeding to revoke petitioner's naturalization. The court made the following findings of fact in an order entered July 13, 1987:

> 1. Johann Leprich was born on July 7, 1925, in Petelea, Romania. Petelea has also been known by the name of Birk in German and Petele in Hungarian.

2. Leprich became a member of the *Waffen* SS in November, 1943.

3. Leprich commenced service as a uniformed SS guard at the Mauthausen concentration camp in November or December, 1943.

4. At Mauthausen, Leprich was a member of the SS *Totenkopf-Sturmbann* (Death's Head Battalion), and wore the skull-and-crossbones symbol on his collar.

(The International Military Tribunal at Nuremberg in 1946 found that the SS, including the Death's Head Battalion, was a criminal organization involved in "the persecution and extermination of Jews, brutalities and killings in concentration camps, excesses in the administration of occupied territories, administration of the slave labor program and the mistreatment and murder of prisoners of war." (See: Nurnberg Trial, 6 F.R.D. page 69, 143.)

5. Leprich continued to serve at the Mauthausen concentration camp until April or May, 1944.

6. Mauthausen was intended as a camp for severe punitive action against enemies of the Reich.

7. Inmates were starved, beaten, tortured, and killed by a variety of methods, including gassing, hanging, strangling, heart injection, electrocution, beating, drowning, torturing, burning, starving, and shooting.

8. Inmates were forced to work at the camp. Many worked at the quarry where they died of overwork, were beaten to death, or were shot by the guards.

9. Prisoners were forced to cross through the chain of guards so that they would be shot by guards.

10. Incarcerated at Mauthausen were groups including Jews, Gypsies, Jehovah's Witnesses, and Poles, as well as members of almost every nationality in Europe.

11. Jews were identified as Jews in the camp and were treated especially harshly because they were Jews.

12. Leprich's duty at Mauthausen was to guard the camp inside which the prisoners lived.

13. While performing guard duty at Mauthausen, Leprich carried a rifle on his shoulder and ammunition.

14. At Mauthausen, Leprich was assigned to numerous guard posts around the camp. He stood guard on the ground and in watchtowers.

15. Leprich received pay for his service as a guard at Mauthausen.

16. Leprich was given days off during his service as a guard at Mauthausen.

17. Leprich remained a member of the *Waffen* SS until his capture by the United States Army in June, 1945.

18. Leprich has never been in Sopron, Hungary.

19. At no time in 1944 or 1945 was Leprich a member of the Hungarian army.

20. Leprich was held as a prisoner-of-war by the United States army until June, 1946.

21. Leprich was issued a visa to immigrate to the United States on February 12, 1952, pursuant to the Displaced Persons Act of 1948, as amended.

22. In his signed and sworn visa application, Leprich listed his residences through 1946 as follows: "1939-1943 Birk, Rumania; May, 1945, soldier in Hungarian army; 1946, Sopron, Hungary."

23. The report of Displaced Persons Commission ("DPC") analyst Edward Kelly refers to Leprich's DPC Fragebogen (application), which gave his history as "Service in the Hungarian Army" from 1943 to 1945 and "Farm help in Hungary and Huettenheim, Germany" from 1945 to 1949.

24. It is untrue that Leprich was a soldier in the Hungarian army from 1943 through May 1945 and that he resided in Sopron, Hungary from May, 1945 through 1946.

25. Upon arriving in the United States, Leprich signed and swore in an affidavit that he had "never advocated or assisted in the persecution of any person because of race, religion, or national origin."

26. In seeking to immigrate to the United States, Leprich never informed any United States official that he had been a member of the *Waffen SS* or a guard at Mauthausen.

27. If it had been known that Leprich had been a member of the *Waffen SS*, immigration officials would have commenced an investigation into the nature of that service.

28. If it had been known that Leprich had been a guard at Mauthausen, he would not have been granted a visa.

> 29. Leprich entered this country on March 29, 1952.
>
> 30. Leprich became a United States citizen on December 30, 1958.

*Leprich*, 666 F. Supp. at 967-68.

Based on these facts, the court revoked petitioner's citizenship, finding that he "was not eligible for the visa he received because (1) he assisted in the persecution of persons due to their race, religion or national origin; and (2) he willfully made material misrepresentations in order to enter this country. Because he was not eligible for his visa, he was never lawfully admitted to this country and his citizenship was illegally procured." *Id.* at 971.

Petitioner's subsequent conduct is summarized in *United States v. Leprich*, Nos. 04-1059, 04-1066 and 04-3337, 169 Fed. Appx. 926 (6th Cir. 2006):

> Leprich did not appeal the district court's 1987 decision; rather, he fled to Canada before the government initiated removal proceedings. Leprich claims to have resided in Canada from 1987 to 2003, but he renewed his Michigan driver's license twice during the 1990s, and the government suspected he remained in the United States during portions of that time. Leprich returned to the United States in April 2003 to visit his wife in Michigan, and, on July 1, 2003, agents from the Department of Homeland Security ("DHS") arrested Leprich after obtaining a lawful search warrant. He has been in custody since his arrest in July 2003.
>
> \*   \*   \*
>
> On October 7, 2003, after being taken into custody, Leprich filed a motion in the United States District Court for the Eastern District of Michigan seeking to vacate the 1987 order revoking his citizenship. In that motion, Leprich argued that, in 1987, the district court granted the government only partial summary judgment, and, therefore, the order revoking Leprich's citizenship was not a final appealable judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure. Because the order was not a final appealable order, according to Leprich, it was not a valid revocation of his citizenship. On December 10, 2003, the district court denied Leprich's motion to vacate, and Leprich now appeals.
>
> Also on October 7, 2003, Leprich filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241, arguing again that the district court's 1987 order was

> not a final appealable order, and, therefore, that he is being detained unlawfully because he is still a United States citizen. On December 10, 2003, the district court denied Leprich's petition for a writ of habeas corpus, and Leprich now appeals.
>
> Lastly, after arresting Leprich in 2003, DHS began administrative removal proceedings, arguing that, because Leprich's citizenship had been revoked in 1987, he is subject to removal. In a decision dated November 21, 2003, an immigration judge found Leprich removable on the basis of an unlawful entry into the United States. On March 4, 2004, the [Board of Immigration Appeals] affirmed that decision. Leprich filed a petition for judicial review in this court. Leprich's petition for review has been consolidated for submission with his other two appeals.

*Leprich*, 169 Fed. Appx. 926, 929-30 (6th Cir. 2006) (footnote omitted).

In its January 11, 2006 decision, the Sixth Circuit affirmed: (1) the district court's denial of petitioner's motion to vacate the 1987 order; (2) the district court's denial of the § 2241 petition; and (3) the Board of Immigration Appeals' finding that petitioner is removable. *Id.* at 934. The Sixth Circuit issued its mandate on March 3, 2006. *See United States v. Leprich*, Nos. 04-1059, 04-1066 and 04-3337 (6th Cir.) (docket sheet).

## II. Respondents' motion to dismiss

Petitioner, through his counsel, filed the present petition for writ of habeas corpus on September 18, 2006. Petitioner alleges that he has no citizenship, that the period of detention authorized by law has expired, and that he should released because "there is no likelihood of his removal in the reasonably foreseeable future." Petition at ¶¶ 1, 18-19. Specifically, petitioner states that he has been in custody for over 38 months, and that neither Germany, Romania nor Hungary will issue travel documents to him or accept him. *Id.* at ¶¶ 16-17.

Respondents agree that none of these countries will accept petitioner:

> Over the past two and one half years, officials from the Department of Justice, the Department of Homeland Security and the Department of State -- including the Attorney General, the Secretary of State, an Assistant Secretary of Homeland Security, and U.S. embassy officials up to and including the rank of

>  Ambassador -- have made repeated, intensive efforts to secure Leprich's removal to Germany, Romania, or Hungary." Those efforts have included, but have no been limited to, a number of face-to-face meetings with high-level foreign officials.
>
>  Despite these energetic efforts -- which continued through early October 2006 -- Germany, Romania, and Hungary have all refused to allow Leprich to return to their countries, and no country willing to accept Leprich has been found. . . "

Respondents' Brief at 6.[1]

Petitioner claims that his continued custody violates the Supreme Court's decision in *Zadvydas v. Davis*, 533 U.S. 678, 701 (2001). Petition at ¶ 18.

The Immigration and Nationality Act, 8 U.S.C. § 1101 et seq. provides:

> An alien ordered removed who is inadmissible under § 1182 of this title, removable under § 1227(a)(1)(C), 1227 (a)(2) or 1227 (a)(4) of this title or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3). 8 U.S.C. § 1231(a)(6) (1994 E.D.), Supp. V.

Thus, the Attorney General has discretion to detain an alien, who has been ordered removed, beyond the removal period provided the alien is likely to flee, which is certainly a characteristic of this petitioner who absconded for 16 years before being apprehended.[2]

The *Zadvydas* court, however, in a 5-4 decision authored by Justice Breyer, held that 8 U.S.C. § 1231(a) does not permit indefinite detention of an alien who has been ordered removed. The court created a presumptive rule that an alien should be released after six months of custody if

---

[1] Notwithstanding respondents' apologia of its "energetic" efforts over the past 2 1/2 years, the record before this court does not explain how petitioner was able to elude federal investigators the prior 16 years, when he was apparently going back and forth between this country and Canada. *See Leprich,* 169 Fed. Appx. at 926 (Government believes Leprich spent portions of his time in the United States during the 1990's, during which period he twice renewed his Michigan driver's license).

[2] Respondents also point out that petitioner failed to surrender his passport as ordered by the court, and that he was finally apprehended only after agents broke into a concealed compartment where he was hiding under his wife's basement staircase.

6

there is "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Zadvydas*, 533 U.S. at 701. Respondents apparently agreed with petitioner's arguments, because they chose to release petitioner from custody on October 16, 2006, less than a month after Leprich filed his petition for a writ of habeas corpus, "having been unable to obtain agreement from any foreign country to admit Leprich," Respondents' Brief at 9, and without awaiting this court's decision on the petition. Having freed Leprich, respondents immediately filed a motion seeking to dismiss his petition as moot.[3]

### III.     Discussion

In order for this court to have jurisdiction over petitioner's habeas claims under § 2241, he must be in government custody. *See Prieto v. Gluch*, 913 F.2d 1159, 1162 (6th Cir. 1990). Once a habeas petitioner is no longer in custody, the court must determine "whether petitioner's subsequent release caused the petition to be moot because it no longer presented a case or controversy under Article III, § 2, of the Constitution." *See Spencer v. Kemna*, 523 U.S. 1, 7 (1998). The relevant and sole inquiry for the court at this time is whether petitioner can demonstrate the existence of collateral consequences, i.e., "some concrete and continuing injury other than the now-ended incarceration," that can be redressed by granting the habeas petition. *See id.* 7-8. Thus, "[a]

---

[3]The convergence of petitioner's abominable history, with Justice Breyer's decision in *Zadvydas* as implemented by the federal authorities, present this court, not to mention American society generally, with the law's version of the 'perfect storm'. Petitioner has no legal claim and less moral claim to be in this country. If, for example, he attempted to wade across the Rio Grande from Mexico and was caught, he would have no greater claim to remain in this country than any other illegal immigrant crossing the river the same night. However, unlike the usual illegal alien who could expect to be quickly returned to his native country, because petitioner was a uniformed member of the Death's Head Battalion of the *Waffen* SS, a criminal organization involved in the "persecution and extermination of Jews" at the Mauthausen concentration camp, where inmates were starved, tortured, gassed, hanged, strangled, drowned, and shot -- crimes which have long sickened humanity -- petitioner's native countries will not take him back. And since they will not, Justice Breyer's decision, at least as understood by respondents, requires that since he made it here, even illegally, he be set free to live in this country indefinitely.

habeas petition will become moot once the prisoner is released from custody unless the petitioner can show some sufficient collateral consequence of the underlying proceeding." *Leitao v. Reno*, 311 F.3d 453, 455 -56 (1st Cir. 2002).

Here, petitioner was released from custody shortly after filing his petition. The petition challenged petitioner's continued confinement as an illegal and permanent detention in violation of the Supreme Court's *Zadvydas* decision. Petitioner does not dispute any previous court order or allege that he suffers any collateral consequences from the government's actions. Indeed, petitioner did not file a response to the motion to dismiss. Under these circumstances, the only issue before the court -- petitioner's continued confinement -- has been disposed of by respondents' action and petitioner's habeas petition is now moot. *See Amazon v. Meissner*, No. 00-6103, 2000 WL 1124537 (4th Cir. Aug. 9, 2000) (deported alien's habeas petition is moot where the petition attacked confinement only, rather than the deportation order, and failed to allege any collateral consequences arising from detention or deportation).

**IV.     Recommendation**

There being nothing left before the court, I am constrained to respectfully recommend that respondent's motion to dismiss (docket no. 5) be **GRANTED** and that the habeas petition be **DISMISSED**.


Dated:  January 31, 2007                         /s/ Hugh W. Brenneman, Jr.
                                                 Hugh W. Brenneman, Jr.
                                                 United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within ten (10) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).